SILVERMANACAMPORA LLP
Proposed Counsel to M. Slavin & Sons, Ltd.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Gerard R. Luckman
Robert Nosek

UNITED STATES BANKRUPTCY COURT
SOURTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| M. SLAVIN & SONS, LTD., | Case No. 11-10589 (\_\_\_) |
| Debtor. | |

---------------------------------------------------------x

## **AFFIDAVIT OF HERB SLAVIN UNDER LOCAL RULE 1007-2**

**STATE OF NEW YORK** )
                              ) ss.:
**COUNTY OF NASSAU** )

     **HERBERT SLAVIN**, being duly sworn, deposes and says:

     1.    I am the Secretary and Treasurer of M. Slavin & Sons, Ltd. ("Slavin" or, the "Debtor"), the above-referenced debtor and debtor in possession.

     2.    I submit this affidavit under S.D.N.Y. Local Rule 1007-2, and in support of the Debtor's voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "Bankruptcy Code"), filed on February 14, 2011.

## **BANKRUPTCY FILING AND COMPLIANCE WITH LOCAL RULE 1007-2**

### Debtor's Business and Operations

     3.    The Debtor is involved in the wholesale and retail sale of seafood on a worldwide basis that originally started as a small fish store in Brooklyn, New York in the early 1900's opened by Morris and Minnie Slavin. Over the years, that Company has grown, through the hard work and dedication of generations of the Slavin family, to become the multifaceted company that is M.Slavin & Sons, Ltd. today. The Debtor continues to specialize in the freshest and highest quality seafood, including whole fresh fish, hand cut fillets, live shellfish, and assortments of breaded, smoked, canned or frozen products.

4. The Debtor's facilities include (i) a major processing plant in the Bronx, New York; (ii) wholesale operations in the New Fulton Fish Market, Bronx, New York; and (iii) a state-of-the-art processing plant in Point Judith, Rhode Island (the "Point Judith Facility") that is a direct receiver of all fresh North Atlantic species and producer of domestic squid under the Point Judith Fishermen's Co. label. The Point Judith Facility is owned by Slavin Point Judith Company, LLC ("Slavin Point Judith"), a wholly owned subsidiary of the Debtor. The Debtor's fleet of refrigerated trucks delivers within the Tri-State area seven days a week to over 1,000 customers, and customer service representatives stand ready to assist customers the world over with their seafood needs 24 hours a day, 365 days a year.

5. The Debtor currently employees approximately 105 people, each of which, in turn, contributes to the local economies of the areas in which they live, with all of those jobs at risk if the Debtor is unable to reorganize.

6. The Debtor and Slavin Point Judith are parties to a revolving credit financing agreement with Capital One, N.A., a national banking association and successor by merge to North Fork Bank ("Capital One"), evidenced by a certain Revolving Credit Note dated August 2, 2007, as amended, in the principal amount of Eight Million ($8,000,000) Dollars (the "Revolving Note")[1]. The Revolving is secured by a lien on substantially all of the Debtor's assets, including, but not limited to, accounts receivables inventory, general intangibles, equipment, fixtures, proceeds of the foregoing, and shares the Debtor owns in cooperative corporations that own the New Fulton Fish Market at Hunts Point, Bronx, New York, but does not include any security interest in fourteen (14) lots of real property, which when assembled together for use, comprise three operating facilities known as and located at 97-99 and 108-120 Thatford Avenue (the "Thatford Property"), 447 Rockaway Avenue (the "Rockaway Property") and 31-39 Belmont Avenue (the "Belmont Property", and collectively with the Thatford Property and Rockaway Property, the "Brooklyn Properties").

---

[1] By Forbearance Agreement effective as of August 2, 2010, the maximum revolving credit amount available under the Note was permanently reduced to Six Million ($6,000,000) Dollars.

7. Unfortunately, 2009 and 2010 were not profitable years for the Debtor, not unlike many other companies during that time period, and it incurred substantial losses for those years. In order to address those losses, prior to the Filing Date, the Debtor hired CoMetrics Partners LLC to assist it in restructuring and right-sizing its businesses. Those efforts included cutting payroll by almost fifty (50%) percent, and developing various other business strategies to decrease expenses and increase revenue, including the shuttering of unprofitable areas of the business. Some, but not all, of those strategies have been implemented, and the Debtor seeks to use its time in bankruptcy to complete that implementation. Successful implementation will form part of the foundation for a feasible, confirmable plan.

Assets and Liabilities

8. Filed substantially contemporaneous with this Affidavit is a list of the (i) creditors holding the twenty (20) largest, unsecured claims against the Debtor, together with their addresses and the amounts due according to the Debtor's books and records, (ii) a summary of the Debtor's assets and liabilities, (iii) the number and class of all equity security holders, together with their addresses, (iv) a list of the premises owned or leased from which the Company operates its business, and (v) unexpired contracts the Debtor has with third parties.

9. The Debtor is a privately held company. At this time, the Debtor's senior management is comprised of Herbert Slavin, the Treasurer and Secretary and Barry Slavin, the Vice President. Additionally, prior to the Filing Date, the Debtor hired CoMetrics Partners LLC ("CoMetrics") to assist it in restructuring and right-sizing its business. The CoMetrics team assigned to the Debtor includes Walter Jones, Gary Herwitz and John Lavin. The Debtor intends to continue to utilize the services of CoMetrics post-petition in order to complete the right sizing of the Debtor's business.

10. The Debtor's assets are comprised primarily of (i) bank accounts totaling approximately $400,000; (ii) accounts receivable totaling approximately $3,151,000 net of allowances; (ii) inventory of approximately $600,000 at cost; (iii) office furnishings; (iv)

equipment; (v) interests in the cooperative corporations that own the New Fulton Fish Market at Hunts Point, Bronx, New York (the "Fish Market"), with corresponding proprietary leases for seventeen (17) units at the Fish Market, including Units 37 and 66; and (iv) thirteen (13) lots of real property, which when assembled together for use, comprise three operating facilities known as and located at 97-99 and 108-120 Thatford Avenue (the "Thatford Property"), 447 Rockaway Avenue (the "Rockaway Property") and 31-37 Belmont Avenue (the "Belmont Property", and collectively with the Thatford Property and Rockaway Property, the "Brooklyn Properties"). All assets except for the Brooklyn Properties are currently encumbered by a first lien in favor of Capital One, N.A., a national banking association and successor by merger to North Fork Bank ("Capital One'), which lien secures a revolving credit loan evidenced by a note in the face amount of $8,000,000.[2]

11. The Debtor's liabilities include (i) approximately $5,457,000 owed to Capital One on the Revolving Note as senior secured debt; (ii) unsecured trade payables totaling approximately $11,000,000; (iii) a long term debt payable owed to the Hunts Point Cooperative Market, Inc. in the approximately aggregate amount of $220,000, secured by a mortgage against Unit 37; and (iv) subordinated debt owed to one or more principals of the Debtor in the approximately aggregate amount of $5,400,000. As of the Filing Date, the Debtor will also owe one week's worth of payroll for the immediately prior work week totaling approximately $119,357, exclusive of officers and directors salaries or CoMetrics costs, and approximately $13,400 in New York City real property tax for the quarter January 1, 2011 – March 31, 2011. Additionally, the Debtor owes approximately $217,000 for pre-petition union benefits, and has received a disputed tax levy of $18,511 by the Internal Revenue Service for 2006 payroll taxes.

12. At this time, no property of the Company is in the possession or custody and control of any public officer, receiver, trustee or assignee for the benefit of creditors.

---

[2] By Forbearance Agreement effective as of August 2, 2010, the maximum revolving credit amount available under the Note was permanently reduced to Six Million ($6,000,000) Dollars.

13. Additionally, the Debtor estimates that its general operating expenses for the first seven weeks of the case ending April 3, 2011 will total approximately $5,484,341, comprised almost entirely of costs of goods totaling approximately $4,419,386 and payroll (including wages, overtime, and vacation) of approximately $780,958, exclusive of officers, directors, and stockholders, which is approximately $111,565 per week. The salary for the officers of the Debtor is estimated at $29,768 per month.

14. The Debtor proposes to remain in chapter 11 only for a limited period of time. The relief sought by the Debtor at this time merely preserves the status quo as it existed immediately prior to the Filing Date.

15. The Debtor believes that with the protection of this Court, it will be able to preserve its assets as a going concern through a feasible and confirmable plan of reorganization.

## **FIRST DAY MOTIONS**

Motion to Approve Use of Cash Collateral

16. As described above, the Debtor is party to the Revolving Note which is secured by substantially all of the Debtor's assets, excluding the Brooklyn Properties. By motion dated February 14, 2011 (the "Cash Collateral Motion"), the Debtor seeks to use the cash collateral of Capital One in order to continue its operations post-petition under terms and conditions reflected in the proposed Interim Cash Collateral Order annexed to the Cash Collateral Motion.

17. The Debtor believes that the Collateral has a collective value of $6,467,000, with the receivables and inventory alone respectively worth $3,151,000 and $600,000 at cost, as of the Filing Date. It should be noted that the accounts receivable of $3,151,000 are net of a reserve for uncollectable accounts of approximately $500,000 and, accordingly, the Debtor believes the $3,151,000 amount is collectable.

18. Substantially all of the remaining value of the Collateral is derived from the value of the Debtor's units at the Fish Market, net of a $220,000 mortgage on Unit 37, and its interest

in Slavin Point Judith. Separately, the Debtor recently listed the Brooklyn Properties for $5.1 million as a group, with individual property groupings ranging from $1.275 million to $2.1 million.

19. The Debtor owes Capital One approximately $5,457,000 on the Loan as of the Filing Date. Thus, before adding the Brooklyn Properties to the Collateral, Capital One is over secured.

20. At this time, the Debtor believes in the short term period ending April 3, 2011 that it can continue operations solely with the use of Cash Collateral and does not need to incur additional indebtedness. The Debtor's cash flow forecast shows the collateral position of Capital One improves during the seven week period ending April 3, 2011 because the Debtor will be generating new accounts receivable (sales) that are greater than what it is collecting in said period. The Brooklyn Properties are currently being offered for sale, but the Debtor may decide that employing the excess equity in those properties as collateral for Debtor in possession financing as an alternative, or supplement, to using the Cash Collateral may be more advantageous to the Debtor's estate and its creditors. Thus, the Debtor reserves the right to use the excess equity in the Brooklyn Properties in order to obtain debtor in possession financing.

21. In fact, the Debtor is in serious negotiations with a finance company to procure a DIP facility of $800,000, which will be utilized for working capital in order for the Debtor to continue purchasing inventory in the ordinary course of business. If the Debtor is successful in obtaining said DIP loan, the Debtor will seek authority to enter into a DIP loan facility collateralized by the unencumbered Brooklyn Properties.

22. Based on the foregoing, the Debtor submits that Capital One is, and will continue to be, adequately protected. Therefore, the Debtor should be permitted to use Capital One's Cash Collateral, on an interim, and final, basis under the terms and conditions reflected in the proposed Interim Cash Collateral Order.

RDN/855726/V1/059611

Payment of Pre-Petition Wages, Vacations, and Overtime

23. The Debtor currently employs approximately 105 employees (the "Employees") in connection with the operation of its business.

24. By motion dated February 14, 2011(the "Wage Motion"), the Debtor also seeks the entry of an Order of the Bankruptcy Court (a) authorizing, but not directing, payment to employees of accrued employee wages and salaries, expenses, and benefits in accordance with the policies and practices established by the Debtor prior to the Petition Date; (b) authorizing, but not directing, the Debtor to perform and honor all other obligations, practices and policies relating to employees; (c) authorizing, but not directing, payment of related taxes, tax deposits and processing fees, (d) authorizing and directing Capital One, N.A. (the "Bank") to honor employee wage and salary checks drawn on the Debtor's payroll account; and (e) authorizing and directing the Bank to honor employee expense reimbursement checks drawn on the Debtor's payroll account.

25. The Wage Motion seeks authority to pay $125,508.41 for last week's wages, overtime, vacation, and related pay, including $6,152.00 to senior management.

26. During this past year, the Debtor decreased operations and terminated many employees. The continued employment of the Employees is vital to the Debtor's continuing operations and its reorganization efforts. The Employees being retained include, but are not limited to, drivers, freezermen, coolermen, filletmen, retail salesmen, fish cleaners, fish packers, and officer personnel. The Debtor must have the ability to meet the needs of these valued employees if it's going concern value is to be preserved.

27. The Debtor employs use of a hand recognition time clock that registers hourly employee's time. Each hourly employee punches in and out every day they work. Each day the information from the time clock is downloaded from the clock to the payroll computer, with the punches checked for accuracy by the end of that day. The week consists of Monday through

Sunday. Each Monday morning after collecting the weekend data, a hard copy of all the time punches is printed.

28. The Debtor processes the payroll through Paypro Corp. ("Paypro") and, after all the punches are checked for accuracy, payroll information is submitted via internet to Paypro. Attendance of the non hourly employee is kept by the payroll administrator and processed through Paypro each week. Payroll is processed on Monday and the hard checks are sent to the Debtor by Tuesday, with the checks having a Friday date. For example a check dated 2/18/2011 would be for the week 2/7/2011-2/13/2011. Thus, the Debtor pays its employees on a weekly basis, one week in arrears. In addition to the weekly hours or days of pay, each employee may receive accrued vacation, personal days or holidays, depending on the time of year.

29. On Tuesday of each week, the physical payroll is checked by the payroll administrator, with the payroll checks distributed on Friday, same day as the check date.

30. Prior to the Petition Date, and in the ordinary course of the Debtor's business, certain of the Employees were owed or had accrued various sums for wages and salaries, and the Debtor remains obligated for federal, state and local withholding taxes on pre-petition employee wage and salaries. Additionally, some of the Employees were entitled to reimbursement of business expenses, and/or accrued employee benefits, including but not limited to those benefits due to the Employees under various health care, welfare, pension and other benefits plans (collectively, the "Compensation").

31. With respect to the accrued and unpaid pre-petition employee wage and expenses, the Debtor requests the Court authorize and direct the Bank Paypro to make such payments and honor such checks or fund transfer requests.

32. In order for the Debtor to continue operations and maximize the value of the assets, it must have the authority to honor its obligations to its employees in the ordinary course of its business.

RDN/855726/V1/059611

33. Without such relief requested granted to its employees, its employees would suffer a tremendous hardship. It is respectfully submitted that any delay in paying the Compensation or reimbursement of business expenses will severely disrupt the Debtor's relationship with its Employees and irreparably harm and/or impair their morale at the very time when the dedication, confidence and cooperation of the Employees is critical. It was, is, and will remain the corporate policy of the Debtor to permit and encourage the Employees to continue their employment with the Debtor.

Continued Use of Bank Accounts and Business Forms

34. The Debtor maintains accounts at separate banks, one operating account at Signature Bank ("Signature"), and an operating account and payroll account at Capital One (collectively, the "Bank Accounts").

35. I am advised by the Debtor's attorneys that all of the Bank Accounts used by the Debtor are designated as authorized depositories by the Office of the United States Trustee for Region 2 pursuant to the UST Guidelines.

Signature Account and Services

36. The Debtor uses Signature for its armored car services. Each day, Signature sends two armed guards to pick up Slavin's cash deposit arising from cash-paying Market customers and wholesale COD deliveries, which are then deposited in the operating account at Signature. Prior to issues developing with Capital One on the Loan, every couple of days Slavin would write a manual check from Signature into the Capital One operating account to clear out the Signature balance. Recently, however, the Debtor expanded its relationship with Signature and now deposits all of its cash and checks into the Signature account. The Debtor intends to continue using Signature's armored car services post-petition.

Capital One Accounts

37. For many years, the Debtor has used Capital One as its primary financial institution, maintaining both an operating account and a payroll account, with checks deposited

directly into the operating account and cash first deposited into Signature and then transferred out every couple of days by manual check also deposited into the Capital One operating account. For payroll, the Debtor would typically transfer within the operating account and payroll account twice a week, Friday and the following Monday, to cover payroll. Payroll taxes are paid through ACH from the operating account. At this time, the Debtor has ceased using the Capital One operating account, but continues to use the payroll account, funded from the Signature operating account.

38. As of the Petition Date, the Debtor operates from three facilities and has a fleet of refrigerated trucks prepared to provide service to customers 7 days a week year-round. For the operation of this enterprise, the Debtor maintains a unified cash management system under which funds are collected by the Debtor, transferred to an operating account and disbursed through the operating account to pay the operating expenses. Under this system, the Debtor receives incoming payments, deposits checks, receives wires and makes disbursements in the ordinary course of business. Disbursements are made through written check, electronic transfers, wire transfers or cash payments.

39. The Cash Management system is managed primarily by the Debtor's book keepers at the offices located at the Debtor's headquarters in The Bronx, New York. Under its Cash Management System, the Debtor is able to monitor collection and disbursements of funds, maintain control over the administration of its bank accounts and provide reports on the amounts of funds.

40. The Debtor seeks the authority to maintain its cash management system post-petition so as to avoid disruption of its ability to collect and transfer funds it receives and make timely payments to satisfy its financial obligations. The Debtor maintains computerized records and reporting with respect to its cash management system and believes that continued utilization of the Debtor's Cash Management System is in the best interests of the Debtor and its estate.

41. The Cash Management System facilitates cash monitoring, reporting, and enables the Debtor to maintain control over the administration of its Bank Accounts,

42. By preserving business continuity, and avoiding the disruption and delay to the Debtor's payroll, disbursement, and collection activities that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, clients, and creditors, will be best served. The benefit to the Debtor, its business operations, and all parties in interest will be considerable.

43. The Debtor believes that the structure and operation of the Cash Management System is not a cause of the Debtor's past and current financial difficulties. The Debtor already banks with depositories approved by the Office of the United States Trustee. Moreover, the Debtor's CFO function is being fulfilled by CoMetrics, a company with experience in operating a business under the strictures of chapter 11 and delineating between pre-petition and post-petition obligations.

44. The Debtor believes, therefore, that its transition to chapter 11 will be more orderly, with minimal costs, if all Bank Accounts are continued following the Petition Date with the same account numbers; <u>provided</u>, <u>however</u>, that checks issued on account of prepetition claims will not be honored, absent a prior order of the Court. By preserving business continuity and avoiding the disruption and delay to the Debtor's collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and clients, will be best served. Accordingly, the Debtor respectfully requests authority to maintain its Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course Bank fees that may be incurred in connection with the Bank Accounts prior to or following the Petition Date.

45. In addition, to minimize expenses, the Debtor further requests that it be authorized to continue to use its correspondence and business forms, including, but not limited to, purchase orders, invoices, multi-copy checks, letterhead, envelopes, and other business

forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to its status as debtor in possession; provided, however, that within seven days after entry of an order granting this application the Debtor shall print "Debtor in Possession" and the chapter 11 case number under which this case is being administered on any new check stock.

46. If the Debtor is not permitted to maintain and utilize its Bank Accounts and continue to use its existing Business Forms, the resulting prejudices will include, among other things, (i) delay in the administration of the Debtor's estate, (ii) costs to the estate to set up new systems, open new accounts, and print new Business Forms; and (iii) upon a successful reorganization, additional, redundant costs to transition from debtor in possession accounts back to regular bank accounts, and printing costs for non-"debtor in possession" branded Business Forms.

47. If the relief requested herein is not granted, the success of the reorganization of the Debtor would undoubtedly be put in jeopardy. Chapter 11 of the Bankruptcy Code is designed to afford an honest Debtor the opportunity to reorganize and to give it a "fresh start." Unless the relief requested herein is granted, the Debtor might well be deprived of that opportunity. Under these circumstances, this Court would be justified in granting this application.

**WHEREFORE**, your deponent requests that (i) the Debtor be continued in the management of its business and financial affairs pending further order of this Court; (ii) an order be entered authorizing the Debtor to use Cash Collateral, on an interim, and final, basis, under the terms and conditions reflected in the proposed Interim Cash Collateral Order annexed to the Cash Collateral Motion; (iii) an order be entered authorizing the Debtor the right, but not the obligation, to make payments to its employees on pre-petition wage and benefit claims; (iv) an order be entered authorizing the Debtor to continue to use its existing cash management

system and business forms; and (v) such other and further relief be granted to the Debtor as is just and proper.

                                                                                 *s/Herb Slavin*  
                                                                                Herb Slavin, Secretary

Sworn to before me this  
14th day of February, 2011

*s/Robert D. Nosek*  
Notary Public

                ROBERT D. NOSEK  
                Notary Public, State of New York  
                No. 02NO6187860  
                Qualified in Nassau County  
                Commission Expires June 2, 2012